UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

AT SEATTLE

| | |
|---|---|
| CHARLES C. WEDDLE, III, derivatively on behalf of nominal defendant Motricity, Inc., | Case No. |
| Plaintiff, | |
| v. | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| RYAN K. WUERCH, ALLYN P. HEBNER, JAMES R. SMITH, JR., JAMES N. RYAN, HUNTER C. GARY, BRETT ICAHN, LADY BARBARA JUDGE, SUZANNE H. KING, BRIAN V. TURNER, JAMES L. NELSON, and JAY FIRESTONE, | JURY TRIAL DEMANDED |
| Defendants, | |
| —and— | |
| MOTRICITY, INC., | |
| Nominal Defendant. | |

VERIFIED SH'HOLDER DERIV. COMPLAINT

**LAW OFFICES OF**
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813  ●  Fax:  (425) 868-7870

Plaintiff Charles C. Weddle, III, by his counsel, submits this verified shareholder derivative complaint.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action brought for the benefit of Nominal Defendant Motricity, Inc. ("Motricity" or the "Company"), against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and other misconduct from June 18, 2010 to the present (the "Relevant Period") that have caused substantial losses and other damages to the Company.[1]

2.      Motricity provides mobile data solutions that enable wireless carriers to deliver mobile data services to their subscribers in the United States, the United Kingdom, the Netherlands, and Singapore.

3.      Plaintiff alleges that the Individual Defendants breached their fiduciary duties during the Relevant Period by disseminating materially false and misleading statements, and failing to disclose material information concerning the Company's true financial condition and business prospects.  Specifically, defendants failed to disclose negative trends in Motricity's business, including with Motricity's most important customers.

4.      On June 18, 2010, Motricity announced the pricing of its Initial Public Offering ("IPO") of 6 million shares of common stock at $10 per share (which included 1 million shares to be purchased at the IPO price of $10.00 per share, less the underwriting discount, by one or more entities affiliated with Carl C. Icahn — who had an existing 18.5% beneficial ownership interest in Motricity) with an overallotment option granted to the underwriters to purchase up to an additional 750,000 shares, for net proceeds of $51.4 million.

---

[1]      Because defendants have failed to take action to remedy the breaches of fiduciary duties that occurred from June 18, 2010 to August 9, 2011, the Relevant Period continues through this day instead of ceasing on August 8, 2011, the day before the public became aware of the wrongdoing at the Company.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 1 -

5.     During the Relevant Period, defendants represented that the Company would continue to prosper despite the increasing popularity of smartphones, which provide Internet access without Motricity's services.  In April 2011, the Company acquired Adenyo, a mobile marketing, advertising, and analytics solutions provider with operations in the United States, Canada, and France.

6.     On May 3, 2011, Motricity issued a press release announcing its first quarter 2011 financial results.  The Company reported a net loss of ($6.1) million, or ($0.15) diluted earnings per share ("EPS"), which included the Adenyo acquisition, and revenue of $32.2 million.  On this news, Motricity's stock dropped $1.82 per share to close at $10.99 per share on May 4, 2011, a one-day decline of 14%, on volume of over 4 million shares.

7.     Then, on August 9, 2011, Motricity issued its second quarter 2011 financial results, reporting a net loss of ($4.3) million, or ($0.09) diluted EPS, including the expenses of the Adenyo acquisition, and revenue of $34.6 million. This result fell well short of Wall Street's forecast.  As a result of this news, Motricity's stock price plummeted, opening at $2.26 per share on August 10, 2011, a decline of 50% on huge trading volume.

8.     The true facts, which were known by the defendants but concealed from the investing public during the Relevant Period, were as follows:

a)     Motricity's business was being adversely affected by rapid adoption of smartphones by consumers such that a smaller portion of the market needed Motricity's services;

b)     Motricity's largest customers were not increasing their demand for Motricity's services to the extent represented; and

c)     Motricity's business was not growing as fast as represented, particularly domestically.

9.     As a result of defendants' false statements, Motricity's stock traded at inflated levels during the Relevant Period.  However, after the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 92% from their Relevant Period high.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 2 -

**JURISDICTION AND VENUE**

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000 exclusive of interest and costs and Plaintiff Weddle is a citizen of Oklahoma. None of the defendants is a citizen of Oklahoma.

11. Motricity has a substantial presence in Washington, operating businesses and facilities in Washington, and Washington is its primary place of business. Each defendant has had substantial and continuous contacts with Washington that make the exercise of personal jurisdiction over them proper. Certain defendants live in and are citizens of Washington.

12. Each defendant has minimum contacts with Washington and the U.S., as they either reside in Washington and the U.S., have frequently traveled here on Motricity business and otherwise, or have voluntarily undertaken fiduciary duties to Motricity—a Washington corporate resident—and authorized acts and actions which have had a sufficient impact in the U.S., Washington, and Motricity and its shareholders and investors residing here to justify the exercise of jurisdiction over them.

13. This action is not a collusive one designed to confer jurisdiction upon a court of the United States that it would not otherwise have.

14. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a) and 1401 because a substantial portion of the transactions and wrongs complained of occurred in this district. Further, defendants either reside or participated in board of director meetings or maintain executive offices in this district and have received substantial compensation in this district by engaging in numerous activities and conducting business in this district. Motricity maintains its principal place of business in this district.

**THE PARTIES**

15. Plaintiff Charles C. Weddle, III is and was during the Relevant Period a shareholder of Motricity. Plaintiff is a resident of the State of Oklahoma.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 3 -

16.     Defendant Motricity provides mobile data solutions that enable wireless carriers to deliver mobile data services to their subscribers in the United States, the United Kingdom, the Netherlands, and Singapore.

17.     Defendant Ryan K. Wuerch ("Wuerch") founded the Company and served as Chief Executive Officer ("CEO") and a director of Motricity until his termination on August 21, 2011.  During the Relevant Period, Wuerch sold 294,800 shares of his Motricity stock for proceeds of over $5.6 million.  Defendant Wuerch signed the Company's false and misleading 2010 Form 10-K.  Upon information and belief, Defendant Wuerch is a resident of Washington.

18.     Defendant Allyn P. Hebner ("Hebner") served as Chief Financial Officer ("CFO") of Motricity until his termination on August 5, 2011.  During the Relevant Period, Hebner sold 55,950 shares of his Motricity stock for proceeds of over $1.1 million.  Defendant Hebner signed the false and misleading 2010 Form 10-K.  Upon information and belief, Defendant Hebner is a resident of Washington.

19.     Defendant James R. Smith, Jr. ("Smith") serves as President and Chief Operating Officer of Motricity and is currently serving as the interim CEO.  During the Relevant Period, Smith sold 150,332 shares of his Motricity stock for proceeds of over $3 million.  Upon information and belief, Defendant Smith is a resident of Washington.

20.     Defendant James N. Ryan ("Ryan") served as Chief Development Officer of Motricity until his termination, effective August 15, 2011. During the Class Period, Ryan sold 71,270 shares of his Motricity stock for proceeds of over $1.3 million.  Upon information and belief, Defendant Ryan is a resident of Washington.

21.     Defendant Hunter C. Gary ("Gary") serves as a director of Motricity.  Defendant Gary signed the false and misleading 2010 Form 10-K.  Defendant Gary is Chairman of the Compensation Committee and is a member of the Audit Committee.  Upon information and belief, Defendant Gary is a resident of New York.

VERIFIED SH'HOLDER DERIV. COMPLAINT     - 4 -

22.    Defendant Brett Icahn ("Icahn") serves as a director of Motricity. Defendant Icahn signed the false and misleading 2010 Form 10-K.  Defendant Icahn is a member of the Audit Committee.  Upon information and belief, Defendant Icahn is a resident of New York.

23.    Defendant Lady Barbara Judge ("Judge") serves as a director of Motricity. Defendant Judge signed the false and misleading 2010 Form 10-K.  Defendant Judge is a member of the Compensation Committee.  Upon information and belief, Defendant Judge is a resident of the United Kingdom.

24.    Defendant Suzanne H. King ("King") served as a director of Motricity until her resignation on June 30, 2011.  Defendant King signed the false and misleading 2010 Form 10-K. Upon information and belief, Defendant King is a resident of Washington, D.C.

25.    Defendant Brian V. Turner ("Turner") served as a director of Motricity until his resignation on July 11, 2011.  Defendant Turner signed the false and misleading 2010 Form 10-K.  Upon information and belief, Defendant Turner is a resident of Washington.

26.    Defendant James L. Nelson ("Nelson") serves as a director of Motricity. Defendant Nelson became a director on June 30, 2011 to fill the vacancy of Defendant King. Defendant Nelson is a member of the Compensation Committee.  Upon information and belief, Defendant Nelson is a resident of Nevada.

27.    Defendant Jay Firestone ("Firestone") serves as a director of Motricity. Defendant Firestone became a director on July 11, 2011 to replace Defendant Turner.  Defendant Firestone is a member of the Audit Committee.  Upon information and belief, Defendant Firestone is a resident of California.

28.    Collectively, Defendants Wuerch, Hebner, Smith, Ryan, Gary, Icahn, Judge, King, Turner, Nelson, and Firestone are sometimes referred to herein as the "Individual Defendants."  Collectively, Defendants Gary, Icahn, Judge, Nelson, and Firestone are sometimes referred to herein as the "Director Defendants."  Collectively, Defendants Wuerch, Hebner, Smith, and Ryan are sometimes referred to herein as the "Insider Selling Defendants."

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 5 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

**DUTIES OF THE INDIVIDUAL DEFENDANTS**

29.     By reason of their positions as officers and/or directors of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were and/or are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and/or are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interests or benefits.  Each director and officer of the Company owed to the Company and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligation of fair dealing.

30.     Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

31.     To discharge their duties, the officers and directors of Motricity were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Motricity. By virtue of such duties, the officers and directors of Motricity were required to, among other things:

(a)     manage, conduct, supervise and direct the business and internal affairs of Motricity in accordance with the laws and regulations of Washington, Delaware, the United States, and pursuant to the charter and bylaws of Motricity;

(b)     neither violate, nor knowingly permit any officer, director or employee of Motricity to violate, applicable laws, rules, and regulations;

(c)     remain informed as to the status of Motricity's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry

VERIFIED SH'HOLDER DERIV. COMPLAINT     - 6 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Motricity and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Motricity's operations would comply with all laws, Motricity's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Motricity shareholders in Annual Reports would be accurate, and the actions of its directors would be in accordance with all applicable laws; and

(f)     exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Motricity by the officers and employees of Motricity and any other reports or other information required by law from Motricity and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Motricity and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32.     During the Relevant Period, the Individual Defendants, as senior executive officers and/or directors of Motricity, were privy to confidential and proprietary information concerning Motricity, its operations and services.  The Individual Defendants also had access to material adverse non-public information concerning Motricity's business, finances, and present and future business prospects, via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that adverse facts specified herein had not been

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 7 -

disclosed to, and were being concealed from, the shareholders and the public.

33.    The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to, the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to shareholders and the public.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Thus, the Individual Defendants had the opportunity to, and did, commit the wrongful acts alleged herein.

34.    As senior executive officers and/or directors of a publicly-traded company whose common stock is registered with the Securities and Exchange Commission ("SEC") pursuant to the Exchange Act and trades on the NASDAQ, the Individual Defendants are governed by the federal securities laws, and had a duty to disseminate accurate and truthful information with respect to Motricity's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects; and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Motricity's common stock would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations. Accordingly, Individual Defendants' breached their fiduciary duties by, among other things, causing and/or recklessly permitting violations of federal securities laws.

35.    Presently, Motricity's Board of Directors consists of five (5) directors: Gary, Icahn, Judge, Firestone, and Nelson.  As established *infra*, Motricity's Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 8 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

the wrongdoing alleged herein because a majority of its members (1) face a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to implement internal financial and accounting controls sufficient to reasonably assure that the Company's financial statements were properly prepared, failure to oversee the Company's compliance with legally mandated disclosure standards, and systemic failure to assure that a reasonable information and reporting system existed; (2) Defendants Gary, Icahn, and Judge are all defendants in a related securities class action lawsuit and cannot bring charges or conduct an investigation against themselves lest they uncover less than favorable evidence; and/or (3) lack the necessary independence with which to objectively consider whether to pursue derivative claims.

**SUBSTANTIVE ALLEGATIONS**

36. Motricity is a provider of mobile data solutions and services that enable wireless carriers to deliver mobile data services to their subscribers. It provides a suite of hosted, managed service offerings, including mobile Web portal, storefront, messaging, and billing support and settlement, which enable wireless carriers to deliver customized, carrier-branded mobile data services to their wireless subscribers. The Company's mCore service delivery platform provides the tools for mobile subscribers to locate and access personally relevant and location-based content and services, engage in social networking and download content and applications. The most important competition for Motricity's services were smartphones, which provided Internet access without Motricity's services. Since smartphones were growing in popularity, Motricity's potential market was gradually declining.

37. Beginning in January 2010, the Company filed a Form S-1 Registration Statement and Amendments thereto (collectively the "Registration Statement") in connection with its IPO. The Registration Statement was declared effective by the SEC on June 17, 2010.

VERIFIED SH'HOLDER DERIV. COMPLAINT     - 9 -

38.     On June 17, 2010, the Company filed a Form S-1/A Registration Statement with the SEC to facilitate the offering of 6 million shares of Motricity common stock to the public.

39.     On June 18, 2010, Motricity issued a press release announcing the pricing of the IPO, which stated in part:

> Motricity, a leading provider of mobile data solutions, announced that it has priced its initial public offering of 6,000,000 shares of common stock at a price of $10 per share. This includes 1,000,000 shares that are being purchased at the initial public offering price, less the underwriting discount by one or more entities affiliated with Carl C. Icahn. Mr. Icahn has an existing 18.5% beneficial ownership interest in the Company prior to this purchase. Motricity's common stock will begin trading on the NASDAQ Global Market today under the symbol "MOTR." The underwriters have a 30-day option to purchase up to an additional 750,000 shares of common stock from the Company at the initial public offering price.
>
> J.P. Morgan Securities Inc. and Goldman, Sachs & Co. are acting as joint book-running managers. Deutsche Bank Securities Inc., RBC Capital Markets Corporation, Robert W. Baird & Co. Incorporated, Needham & Company, LLC and Pacific Crest Securities LLC are acting as co-managers.

40.     On June 21, 2010, the Company issued its Prospectus in connection with the IPO. The Prospectus emphasized the growth potential of Motricity's market:

> The Yankee Group estimates that the mobile data services market in the U.S. will grow from $40 billion in 2009 to $48 billion in 2013, and worldwide will grow from $195 billion in 2009 to $253 billion in 2013. The mobile data services market predominantly includes data access, content and applications, commerce and messaging services.

41.     The Prospectus further represented the Company's competitive strengths:

> *Strong Relationships with Wireless Carriers.* We have well-established relationships with the top wireless carriers in the U.S. market, including Verizon Wireless, AT&T, Sprint and T-Mobile USA and anew relationship with XL Axiata in Indonesia. We believe that we have been an integral partner with our wireless carrier customers and have assisted them with all phases of their mobile

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 10 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813  ●  Fax:  (425) 868-7870

data services strategies, including design, development, deployment, provisioning, management, billing and customer support.

*Deep Integration within the Mobile Data Ecosystem.* Our mCore service delivery platform is deeply integrated into our wireless carrier customers' systems, with the result that we can more effectively deliver an enhanced mobile data experience to their subscribers. We connect directly into our wireless carrier customers' wireless network infrastructure as well as their provisioning and billing systems and their customer care systems.  We also provide various interfaces to enable our wireless carrier customers to directly manage the content and presentation of their mobile data service experience. In addition, as our platform becomes more deeply integrated with an increasing number of content and application providers, we provide carriers with greater access to content and application providers.

*Highly Scalable Platform.* Our mCore service delivery platform has been built using a flexible modular architecture that enables wireless carriers to deliver a highly scalable and highly reliable, carrier-branded experience.

*Comprehensive Expertise in Managed Service Operations.* Through the delivery of MaaS, Mobile as a Service™, solution, we develop, implement and operate a very large and complex managed service environment, serving approximately 35 million monthly active users across multiple carriers and geographies with a carrier-grade level of quality and reliability. We deliver these services to the world's leading carriers, application and content providers ranging in complexity from rollout and testing of minor customizations to major new strategic initiatives involving numerous third parties and onboarding of content and roll-out of a continually expanding set of devices. Our managed service environment consists of thousands of servers across multiple datacenters and is capable and contracted to deliver highly reliable service delivery reaching up to 99.999% availability.

42.    The Prospectus also emphasized Motricity's future growth opportunities:

*Expand International Presence.*  We intend to expand our business in developed and emerging international markets, such as those in Southeast Asia, India and Latin America. We recently entered into an agreement with XL Axiata, a wireless carrier in Indonesia. We intend to apply our expertise gained from the U.S. market and fully leverage the capabilities and scale of the mCore platform to enable the rapid deployment of advanced mobile data services in these new markets in a cost-effective and efficient manner.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 11 -

*Maintain and Extend Our Technological Leadership.*   We believe that we are a market leader in mobile data services and solutions in terms of technological capabilities, market share and range of service offerings, and we intend to expand on this position.  We intend to continue to enhance the mCore platform, and introduce new solutions that increase the total value we provide to our carrier and enterprise customers.

*Advance Into New Market Segments.*  We intend to leverage our core competencies, technologies, and existing market position to broaden our offerings and customer base and advance into new market segments.  We intend to leverage our data-rich insights into subscriber behavior and our user interface expertise to expand our offerings of highly targeted mobile marketing solutions.

*Enhance Smartphone Solutions.*  We intend to extend further our support for new versions of smartphones and extend our support for data-rich applications which have higher rates of data consumption on these mobile devices. In addition, we will continue to leverage our subscriber behavior insights and user interface expertise to offer more personalized and richer experiences to smartphones. We expect to fully capitalize on the extensive capabilities of smartphones and their significant market adoption.

43.    On August 3, 2010, Motricity issued a press release announcing its financial results for the second quarter of 2010, the period ended June 30, 2010. For the quarter, the Company reported that revenue increased 5% to $30.4 million. Defendant Wuerch commented on the results, stating, in pertinent part, as follows:

"Solid execution, accelerated revenue growth and significant margin expansion enabled Motricity to exceed expectations in revenues, Adjusted EBITDA and Adjusted Net Income," said Ryan Wuerch, chief executive officer.  "Motricity's mCore platform is driving mobile data services and mobile internet growth for some of the largest carriers and enterprises in the world. Our ability to deliver 'Mobile as a Service' through a cloud computing environment is producing strong results that were evidenced in the second quarter. Our domestic business is continuing to grow as AT&T has contracted to implement our next-generation storefront solution —Marketplace. Moreover, we signed a multi-year extension to our longstanding relationship with Verizon Wireless, which includes enabling the mobile internet across Verizon's newest smartphones such as the HTC Incredible and Droid X. We are capitalizing on the massive global opportunity for mobile internet users by adding XL Axiata in Indonesia, one of the largest and fastest

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 12 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

growing carriers in Southeast Asia, as the first customer in our Asia Pacific region growth strategy. We believe that this new relationship is a powerful leading indicator that carriers are turning to Motricity as their mobile data services partner of choice on a worldwide basis."

44.    On November 2, 2010, Motricity issued a press release announcing its financial results for the third quarter of 2010, the period ended September 30, 2010. For the quarter, the Company reported that revenue increased 35% year-over-year to $37.9 million. Defendant Wuerch commented on the results, stating, in pertinent part, as follows:

"Motricity has an exceptional, global opportunity, and we made substantial progress during the third quarter. As a mobile Internet pure-play, we believe we are well-positioned to drive strong growth year-over-year through the fourth quarter and beyond," said Ryan Wuerch, chief executive officer.  "In North America, we successfully launched AT&T's AppCenter, powered by mCore Marketplace, providing AT&T's subscribers a broad range of content including applications, music, videos and games with highly-personalized merchandizing and a new, simplified express purchase process. We also rolled-out MobileCast, a compelling new content management service giving carriers an intelligent architecture to drive mobile data services revenues through delivery of relevant media, applications and digital goods directly to subscribers' smartphones."

"We continue to capitalize on the unparalleled opportunities available in the emerging international markets and strengthened this position by launching XL Axiata's XLGo! in Indonesia, and by becoming the mobile data services provider for one of India's largest operators, Reliance Communications, with over 105 million subscribers. We experienced additional gains in Adjusted EBITDA and Adjusted Net Income, driving margin and shareholder value by leveraging our 'Mobile as a Service' cloud computing model," added Wuerch.

45.    In response to the earnings announcement and the subsequent conference call, shares of the Company's stock rose $6.49 per share over the next four trading days to close at $30.74 per share on November 9, 2010, the Company's Relevant Period high.

46.    On February 8, 2011, Motricity issued a press release announcing its fourth quarter and fiscal year 2010 financial results. The Company reported net income of $2.9 million,

VERIFIED SH'HOLDER DERIV. COMPLAINT    - 13 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

or $0.06 diluted EPS, and revenue of $36 million for the fourth quarter. The Company additionally reported revenue for the full year 2010 of $133.4 million. The release stated in part:

> 2010 was a breakout year for Motricity. During our first six months as a publicly-traded company we posted strong revenue, margin and profit growth," said Ryan Wuerch, chief executive officer. "Since our [PO last June, Motricity has strengthened its leadership position within the industry. We have continued to deliver market leading solutions for AT&T, Verizon and Sprint while aggressively expanding our international footprint — signing six new international operators throughout SE Asia and India — more than doubling our global addressable market opportunity. Moreover, in the fourth quarter we developed and launched a new solution in partnership with Sprint and HSN highlighting how Motricity's mCore platform delivers smartphone solutions that enhance the mobile experience on behalf of our enterprise customers."

> Our proposed acquisition of Adenyo, a global leader in mobile advertising, marketing, and-analytics; further expands our immediate market opportunity into the rapidly growing mobile advertising and marketing space which ABI Research estimates will reach $29.9 billion in 2014 globally. Motricity has the opportunity to further monetize its access to over 350 million subscribers by integrating Adenyo's technology and deep enterprise and agency relationships into our mCore platform. Motricity's long-term objective is to participate in the direct and indirect monetization of over a billion users coming through our cloud-based, mCore platform. Motricity's ability to deliver highly personalized, relevant content and value-added services to mobile users globally through our 'mobile as a service' offering provides us with the most comprehensive mobile data services platform in the market today," added Wuerch.

47.     On February 28, 2011, Motricity filed its Form 10-K with the SEC for the fiscal year ended December 31, 2010 ("2010 10-K")[2] and reiterated the Company's financial results that were contained in the February 8, 2011 Press Release.  The 2010 10-K was signed by Defendants Wuerch, Hebner, Judge, Gary, Icahn, King, and Turner.  The 2010 10-K described the Company's business and stated, in pertinent part, as follows:

---

[2]     The Company amended its 2010 10-K on May 2, 2011.  The 10-K/A indicated that the Form 10-K was being amended "to provide additional information required by Part III of the Form 10-K" and further explained that the amendment "does not change the previously reported financial statements or any other disclosures contained in Part I or Part II of the Form 10-K."

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 14 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

**Our growth strategy**

*Expand international presence.* We intend to expand our business in developed and emerging international markets, such as those in Southeast Asia, India and Latin America. We recently entered into an agreement with XL Axiata, a wireless carrier in Indonesia as well as Reliance in India, Celcom in Malaysia, Robi in Bangladesh, Dialog in Sri Lanka and Hello in Cambodia. We intend to apply our expertise gained from the U.S. market and fully leverage the capabilities and scale of the mCore platform to enable the rapid deployment of advanced mobile data services in these new markets in a cost-effective and efficient manner.

*Gain additional scale, technology and access to new markets through acquisitions.* We have historically acquired various businesses and technologies to grow our revenue and service capabilities. We expect to continue targeting acquisition candidates in the mobile data services market that have revenue expansion opportunities or complementary technology and solutions. We also expect to evaluate acquisition candidates that will enable us to expand our business and to enter markets adjacent to our core business or into new geographic markets.

*Expand our strong relationships with our wireless carrier customers.* We intend to continue to expand our relationships with industry-leading participants, particularly top U.S. and international wireless carriers.

*Advance into new market segments.* We intend to leverage our core competencies, technologies and existing market position to broaden our offerings and customer base and advance into new market segments, including expanding our position serving enterprise customers. We intend to leverage our data-rich insights into subscriber behavior and our user interface expertise to expand our offerings of highly targeted mobile marketing solutions.

*Maintain and extend our technological leadership.* We believe that we are a market leader in mobile data services and solutions in terms of technological capabilities, market share and range of service offerings, and we intend to expand on this position. We intend to continue to enhance the mCore platform, and introduce new solutions that increase the total value we provide to our carrier and enterprise customers.

*Enhance smartphone solutions.* We intend to extend further our support for new versions of smartphones and extend our support for data-rich applications which have higher rates of data consumption on these mobile devices. In addition, we

VERIFIED SH'HOLDER DERIV. COMPLAINT       - 15 -

will continue to leverage our subscriber behavior insights and user interface expertise to offer more personalized and richer experiences to smartphones. We expect to fully capitalize on the extensive capabilities of smartphones and their significant market adoption.

*Adenyo acquisition.* The proposed Adenyo acquisition will expand our market opportunity and strengthen our position as the leading mobile internet platform for the monetization of content and data. With Adenyo's mobile advertising, marketing and analytics technology, we will be well positioned to capitalize on the exponential growth in our industry.

48. On April 14, 2011, Motricity issued a press release announcing the acquisition of Adenyo, a mobile marketing, advertising and analytics solutions provider with operations in the United States, Canada and France. The release stated in part:

"With the acquisition of Adenyo and integration of their platform into mCore, we are changing the landscape of the mobile data services industry. Innovative operators, brands and agencies can now leverage Motricity's software as a service platform to provide highly targeted mobile advertising, marketing and analytics solutions. Our expertise will help them expand their market reach and provide their customers with relevant content and services. Motricity is creating new revenue opportunities by expanding its customer base to include global brands and ad agencies," said Ryan Wuerch, chief executive officer of Motricity. "Our focus in the coming years is to have one billion mobile customers worldwide accessing these offerings and services through Motricity's mCore platform."

49. According to the Company's Form 8-K filing with the SEC, Motricity paid $49.1 million in cash and issued nearly 3.3 million shares of its common stock as consideration for the acquisition.

**The Truth is Revealed**

50. On May 3, 2011, Motricity issued a press release announcing its first quarter 2011 financial results. The Company reported a net loss of ($6.1) million, or ($0.15) diluted EPS, which included the Adenyo acquisition, and revenue of $32.2 million. The release stated in part:

"Motricity drove strong year-over-year growth in revenue and margin," said Ryan Wuerch; chief executive officer of Motricity. "Our international deployments with customers including XL, Celcom, Robi, Hello, Dialog and Reliance are on track,

VERIFIED SH'HOLDER DERIV. COMPLAINT   - 16 -

and managed services revenue from our new international customers grew 50 percent over the prior quarter. These facts, along with very encouraging usage metrics such as XL's recently reported 44% year-over-year growth in data revenue and 6 million users on XL!Go powered by Motricity, are strong leading indicators of substantial international growth."

"Our international mobile operator sales pipeline has grown ten-fold since this time last year, including targets in Southeast Asia, India, Latin America and Europe with several at the final sales stage. The addition of mobile advertising and marketing capabilities to our mCore platform is amplifying these opportunities. In a global market of over 4.5 billion mobile subscribers, Motricity is uniquely positioned to empower mobile operators, brands and advertising agencies to capitalize on the dynamic growth of the mobile internet," added Wuerch.

51.    In response to this announcement of a net loss for the quarter, the price of Motricity common stock fell $1.82 per share, or approximately 14%, to close at $10.99 per share, on volume of over 4 million shares.

52.    Then, on August 9, 2011, Motricity issued its second quarter 2011 financial results, reporting a net loss of ($4.3) million, or ($0.09) diluted EPS, including the expenses of the Adenyo acquisition, and revenue of $34.6 million. This result fell well short of Wall Street's forecast. The release stated in part:

"Our financial results are below our expectations, due to headwinds in our North America carrier business, increased competition in the international market which impacted our ability to close new deals, and a later than expected closing of the Adenyo transaction. We are providing a greater level of revenue detail in this press release on the primary areas of our business — North American Carrier, International Carrier and Mobile Marketing and Advertising — so that investors can better understand our company," said Ryan Wuerch, chief executive officer of Motricity.

53.    The press release further revealed the departure of Defendants Hebner and Ryan:

"At the senior level of management, we are initiating a transition in the CFO position to replace Allyn Hebner, who will assist with the transition. We also made the decision to make another transition in our senior team with Jim Ryan, who has previously served as our Chief Strategy and Marketing and Development

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 17 -

Officer and whose responsibilities are now being handled by others," added Wuerch.

54.     A corresponding Form 8-K filed by the Company that same day revealed that the employments of Defendant Hebner and Defendant Ryan had, in fact, been terminated.

55.     As a result of this news, Motricity's stock price plummeted, opening at $2.26 per share on August 10, 2011, a decline of 50% on huge volume.

56.     On August 22, 2011, the Company issued a press release announcing the termination of Defendant Wuerch's employment with Motricity and the resignation of his membership on Motricity's Board.  The press release further announced that Defendant Smith would act as the Company's interim CEO.

57.     The true facts, which were known by the defendants but concealed from the shareholders and the public during the Relevant Period, were as follows:

a)     Motricity's business was being adversely affected by a faster than expected adoption of smartphones by consumers such that a smaller portion of the market needed Motricity's services;

b)     Motricity's largest customers were not increasing their demand for Motricity's services to the extent represented; and

c)     Motricity's business was not growing as fast as represented, particularly domestically.

58.     After the above revelations seeped into the market, the Company's shares were hammered by massive sales, sending them down over 92% from their Relevant Period high.  Moreover, the recent securities class action(s) will undoubtedly harm the Company's reputation and will cost Motricity millions of dollars to defend.  Thus, the Company and its shareholders have been substantially damaged by the Individual Defendants' breaches of their fiduciary duties and will continue to be damaged by these breaches into the foreseeable future.

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

**DEFENDANTS BREACHED THEIR FIDUCIARY DUTIES**

59. As alleged herein, Defendants have breached their fiduciary duties in that Defendants: (i) knowingly and substantially participated or acquiesced in the issuance of public documents and statements issued or disseminated in the name of the Company (or in their own name) that were materially false and misleading; and/or (ii) have failed to remedy such offenses by commencing a derivative action on behalf of the Company. Indeed, defendants violated their fiduciary duties of loyalty and due care by: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Motricity. For some, defendants' deceptive scheme was a success, as it: (i) deceived the investing public regarding Motricity's prospects and business; (ii) artificially inflated the price of Motricity common stock; and (iii) allowed certain Individual Defendants to sell over $11 million worth of their own Motricity stock at artificially inflated prices.

**Issuance of Misleading Statements**

60. The statements detailed above were inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein. Individual Defendants, by virtue of their control over and/or receipt of information reflecting the true facts regarding Motricity, either caused the issuance of the materially misleading statements or failed to timely correct such statements. These defendants each had a duty to ensure that such statements were accurate and contained all facts required to be stated therein, and that there were no omissions of material facts that would make the statements misleading. In the exercise of reasonable care, each of the Individual Defendants should have known of the material misstatements contained in the Company's press releases and SEC filings and also should have known of the omissions of material facts that were necessary to make the statements made therein not misleading. As such, the Individual Defendants breached their fiduciary duties.

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 19 -

**Self-Dealing**

61.    Similarly, Insider Selling Defendants Wuerch, Hebner, Smith, and Ryan have breached their fiduciary duties.  Defendants Wuerch, Hebner, Smith, and Ryan misrepresented the financial posture of the Company and the size of the Company's growth prospects and simultaneously sold personally held stock at artificially inflated prices.

62.    During the Relevant Period, Defendant Wuerch sold 294,800 shares of his personally held Motricity stock for ***proceeds of more than $5.6 million***.  As a director, founder, and Chief Executive Officer of Motricity, Defendant Wuerch was in possession of material adverse information about the Company.  Rather than disclosing the adverse information to the public, Defendant Wuerch used his inside information to secure financial gains for himself.

63.    Similarly, Defendant Hebner sold 55,950 shares of his personally held Motricity stock for ***proceeds of more than $1.1 million***.  As Chief Financial Officer of the Company, Defendant Hebner was in possession of material adverse information about Motricity, but instead of disclosing the adverse information to the public, Defendant Hebner used this inside information to secure financial gains for himself.

64.    Defendant Smith likewise sold 150,332 shares of his personally held Motricity stock for ***proceeds of more than $3.0 million***.  As President and Chief Operating Officer of the Company, Defendant Smith was in possession of material adverse information about Motricity but failed to disclose the adverse information to the shareholders and the public.  Instead, Defendant Smith used this inside information to his own personal profit.

65.    Additionally, Defendant Ryan sold 71,270 shares of his personally held Motricity stock for ***proceeds of more than $1.3 million***.  As a director of the Company, Defendant Ryan was in possession of material adverse information about Motricity.  Rather than disclosing the adverse information to the public, Defendant Ryan used this inside information to secure financial gains for himself.

*66.*    Insider Selling Defendants Wuerch, Hebner, Smith, and Ryan impermissibly allowed their desire for personal gain to cloud their judgment as to the veracity of the statements

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 20 -

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

made on behalf of the Company during the Relevant Period.  As such, Defendants Wuerch, Hebner, Smith, and Ryan have breached their fiduciary duty of loyalty to the Company and its shareholders.

**Failure to Remedy**

67.    The Individual Defendants are continuing to breach their fiduciary duties by failing to commence derivative proceedings against any officer and/or director for their breaches of fiduciary duties despite the overwhelming evidence of such breaches.  Such a failure runs contrary to the fiduciary obligations the Individual Defendants owe to the Company and its shareholders.  The Individual Defendants' failure to remedy the aforementioned offenses is an effective ratification of the wrongdoing and constitutes a breach of the Individual Defendants' fiduciary duties.

**DERIVATIVE AND DEMAND-FUTILITY ALLEGATIONS**

68.    Plaintiff brings this action derivatively in the right and for the benefit of Motricity to redress injuries suffered by Motricity as a result of breaches of fiduciary duties by the Director Defendants.

69.    This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

70.    Plaintiff will adequately and fairly represent the interests of Motricity and its shareholders in enforcing and prosecuting Motricity's rights.

71.    Plaintiff is, and was throughout the Relevant Period, an owner of Motricity common stock.

72.    Motricity's Board of Directors as of the time of the filing of this Complaint consists of five (5) members: Gary, Icahn, Judge, Nelson, and Firestone.

73.    Plaintiff has not made a demand on the Board of Directors to bring the causes of action alleged herein because such a demand would be futile.  In addition, Motricity's Board of Directors is unable to make an impartial determination as to whether to institute legal proceedings to redress the wrongdoing alleged herein because a majority of its members: (1) face

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 21 -

a substantial likelihood of liability for non-exculpated breaches of their fiduciary duties to the Company by their participation or acquiescence in the wrongdoing alleged herein and/or complete failure to perform their oversight duties to the Company, failure to implement internal financial and accounting controls sufficient to reasonably assure that the Company's financial statements were properly prepared, failure to oversee the Company's compliance with legally mandated disclosure standards, and systemic failure to assure that a reasonable information and reporting system existed; (2) Defendants Gary, Icahn, and Judge are each named as defendants in a related securities class action lawsuit and cannot bring charges or conduct an investigation against themselves without potentially uncovering less than favorable evidence; and/or (3) lack the necessary independence with which to objectively consider whether to pursue derivative claims.

**Substantial Likelihood of Liability for the Entire Board of Directors**

74. Director Defendants acted in bad faith by breaching their fiduciary duties in failing to adequately manage and oversee the Company which has, as alleged herein, severely impacted the Company's financial condition and future prospects.

75. By failing to satisfy their fiduciary duties, defendants caused irreparable harm to the Company amounting to millions of dollars and potentially threatening Motricity's ability to exist in the future. As a result of the defendants' failure to carry out their fiduciary duties, Motricity misled its shareholders and the general public regarding its financial results and regarding the effectiveness of its internal controls.

76. Motricity's Corporate Governance Principles explain that "[t]he Board plays the central role in the Company's corporate governance and oversees the work of management and the execution of the Company's business strategies on behalf of the Company's shareholders." The Company's Corporate Governance Principles identify the Board's "Mission and Principle Functions" as follows:

> The Board of the Company is elected by the shareholders with the responsibility to oversee management activities and to advise on long-term and strategic issues,

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 22 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

all with a view to enhancing the long-term value of the Company to the shareholders. The Board's responsibilities require it to regularly monitor the effectiveness of management's policies and decisions, including the execution of strategic plans and the achievement of goals and objectives, and hold senior management accountable for the pursuit of these strategies, goals and objectives. The Board is accountable to the shareholders of the Company, and the Board has adopted these Principles as part of the Board's commitment to achieving the foregoing.

77. Each Director Defendant had a duty to diligently evaluate information provided to the Board by management and to ensure that reasonable systems of reporting existed. It was the duty of the Director Defendants to properly evaluate this information and provide thorough guidance and governance to the Company. The Director Defendants failed in these duties. The Director Defendants either: (i) knowingly and intentionally rubber-stamped Motricity's misrepresentations and unrealistic business strategy; or (ii) recklessly failed to evaluate the relevant information to ensure that materially false and misleading statements were not being publically issued.

78. Each of the Director Defendants faces a substantial likelihood of liability in this action because of each Defendant's failure, as a director, to assure that reliable systems of financial controls were implemented and functioning effectively to prevent the Company from improper financial reporting. The dramatic breakdowns and gaps in those controls were so widespread and systemic that each of the Director Defendants faces substantial exposure to liability for their total abrogation of their fiduciary duties.

79. Director Defendants Judge, Gary, and Icahn directly attested and approved, by their signatures, the materially false and misleading statements made by Motricity in the Company's Form 10-K for 2010. The Form 10-K failed to reveal that: (i) Motricity's business was being adversely affected by a faster than expected adoption of smartphones by consumers such that a smaller portion of the market needed Motricity's services; (ii) Motricity's largest customers were not increasing their demand for Motricity's services to the extent represented; and (iii) Motricity's business was not growing as fast as represented, particularly domestically.

VERIFIED SH'HOLDER DERIV. COMPLAINT    - 23 -

80. By signing the 2010 Form 10-K, Defendants Judge, Gary, and Icahn asserted to investors and the public that the statements and financial representations contained therein were accurate and true. The Director Defendants affixed their signatures to the materially misleading SEC filings, including the Form 10-K, in bad faith. Indeed, based on the duration, size, and blatancy of the material weaknesses existing in Motricity's internal controls over financial reporting, the Director Defendants either knew of, or recklessly disregarded, the false statements and misrepresentations contained within the SEC filings, making them accessories to the false statements and misrepresentations. Director Defendants Judge, Gary, and Icahn, therefore, face a substantial likelihood of liability.

81. Because each of the Director Defendants faces a substantial likelihood of liability for un-exculpated breaches of duty, demand is excused.

**Additional Substantial Likelihood of Liability for the Audit Committee Defendants**

82. Defendants Gary and Icahn were, during the Relevant Period and presently, members of the Audit Committee of the Company's Board of Directors. Defendant Firestone has been a member of the Audit Committee since July 11, 2011.[3]

83. The audit committee plays an important part in a board of director's oversight of any company. The members of the audit committee are charged with superior knowledge, and they are presumed to be knowledgeable about the basis of the financial information a company releases to the public. According to SEC Release No. 33-8220 (April 9, 2003):

> Accurate and reliable financial reporting lies at the heart of our disclosure-based system for securities regulation, and is critical to the integrity of the U.S. securities markets. Investors need accurate and reliable financial information to make informed investment decisions. Investor confidence in the reliability of corporate financial information is fundamental to the liquidity and vibrancy of our markets.

---

[3] Defendants King and Turner were also members of the Audit Committee prior to their respective resignations.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 24 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

Effective oversight of the financial reporting process is fundamental to preserving the integrity of our markets. The board of directors, elected by and accountable to shareholders, is the focal point of the corporate governance system. The audit committee, composed of members of the board of directors, plays a critical role in providing oversight over and serving as a check and balance on a company's financial reporting system. The audit committee provides independent review and oversight of a company's financial reporting processes, internal controls and independent auditors. It provides a forum separate from management in which auditors and other interested parties can candidly discuss concerns. By effectively carrying out its functions and responsibilities, the audit committee helps to ensure that management properly develops and adheres to a sound system of internal controls, that procedures are in place to objectively assess management's practices and internal controls, and that the outside auditors, through their own review, objectively assess the company's financial reporting practices.

84.    Motricity's lack of adequate internal controls rendered its Relevant Period financial reporting inherently unreliable and precluded the Company from properly preparing and issuing its financial statements.

85.    The Audit Committee is responsible, by its Charter, for preparing, reviewing, and discussing with management and independent auditors, Motricity's financial statements.  The Audit Committee is also responsible for discussing Motricity's internal audit function and reviewing reports concerning the Company's operation of internal controls.  Thus, the Audit Committee was responsible for overseeing and directly participating in Motricity's financial reporting process.

86.    The responsibilities of the Audit Committee, as specifically delineated in the Audit Committee Charter, are stated in relevant part as follows:

i.    Assist the Board in overseeing (i) the quality and integrity of the Company's financial statements, (ii) the Company's accounting and reporting policies and procedures, (iii) the Company's compliance with legal and regulatory requirements that may have a material impact on the Company's financial statements, (iv) the independent auditor's qualifications, independence and performance, (v) the Company's disclosure controls and procedures, and (vi) the Company's internal control over financial reporting;

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 25 -

ii.      Provide the Board with the results of the Committee's monitoring and recommendations derived therefrom; and

iii.     Provide to the Board such additional information and materials as it may deem necessary to make the Board aware of significant financial matters that require the attention of the Board.

* * *

*Internal Control*

- Review on a continuing basis (i) the adequacy and effectiveness of the Company's system of internal control over financial reporting (including any material weaknesses and significant deficiencies) and (ii) any significant changes in such internal control over financial reporting that is reported to the Committee by the independent auditor, the internal auditor or management. Such review shall include meeting periodically with the Company's management, the internal auditor, and the independent auditor to review their respective assessment of the adequacy of such internal controls.

- Review any reports by management or the internal auditor regarding the effectiveness of, or any deficiencies in, the design or operation of the Company's internal control over financial reporting and any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's internal control.

- Review and discuss disclosures made by the CEO and CFO in connection with the certification of the Company's annual and quarterly reports and the matters covered by such disclosures.

- Institute special investigations with full access to all books, records, facilities and personnel of the Company, when the Committee, in its discretion deems such an investigation is necessary.

* * *

*Risk Assessment and Management*

- Periodically review and discuss with management the Company's major risk exposures with respect to the Company's accounting and financial reporting

VERIFIED SH'HOLDER DERIV. COMPLAINT       - 26 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

policies and procedures and the measures management has taken to monitor, measure and control such exposures and elicit recommendations for the improvement of the Company's risk assessment and mitigation procedures. The Committee shall promptly report to the full Board any risk that is reasonably likely to be material to the Company.

87.    In spite of these specific directives, Defendants Gary, Icahn, and Firestone breached their fiduciary duties of due care and loyalty based on the Audit Committee's failure to disclose material facts to shareholders during the Relevant Period.

88.    Particularly Defendants Gary and Icahn breached their fiduciary duties by authorizing the issuance of Motricity's SEC filings and financial releases, including the 2010 Form 10-K, which contained materially false and misleading statements about the Company's financial results, business potential and financial future.  As members of the Audit Committee, Defendants Gary and Icahn were directly involved in preparing or reviewing such materially false and misleading statements.  The conduct of Defendants Gary and Icahn was particularly egregious in that they were members of the Audit Committee and were responsible for overseeing the Company's internal control functions during the Relevant Period.

89.    As detailed above, the Company's Board of Directors and the members of its Audit Committee wholly abdicated their responsibilities to the Company and its shareholders by failing to implement adequate accounting procedures and internal controls necessary to provide reasonable assurance that the Company's financial statements were accurate and in compliance with all federal and state laws.  In light of this, Defendants Gary, Icahn, and Firestone face a substantial likelihood of liability for their breaches of fiduciary duty and any demand upon them would be futile.

<b>Additional Substantial Likelihood of Liability<br>for the Compensation Committee Defendants</b>

90.    Director Defendants Gary (Chairperson) and Judge are further exposed to liability because of their participation on the Compensation Committee.  In these positions they approved compensation and finance plans for senior executives, including Defendants Wuerch, Hebner,

VERIFIED SH'HOLDER DERIV. COMPLAINT       - 27 -

Smith, and Ryan, pursuant to which substantial sums of money were paid out by the Company based on financial results that have turned out to be founded on materially misleading information and were thereby artificially inflated. The Compensation Committee members either knew or should have known of the financial misrepresentations described above, given their size, duration, and blatancy. As a result, these defendants face a sufficiently substantial likelihood of liability for their breaches of fiduciary duties and any demand upon them would be futile.

**The Members of the Board of Directors Lack Disinterestedness and Independence**

91.    Defendants Icahn, Gary, and Nelson have aligned interests and are incapable of objectively considering a demand. Indeed, Defendants Icahn, Gary, and Nelson are each employees of company's owned or substantially controlled by Carl Icahn and have personal relationships with Carl Icahn and each other.

92.    Defendant Icahn is the son of Carl Icahn. Defendant Icahn has held numerous positions on various entities owned or controlled by Carl Icahn. From 2002 to 2010, Defendant Icahn served as an investment analyst at Icahn Capital LP. Defendant Icahn also serves as a director of The Hain Celestial Group, Inc., Cadus Corporation, Take-Two Interactive Software, Inc., and American Railcar Industries, Inc. Each of these companies is a company for which Carl Icahn owns or has a substantial ownership interest.

93.    Defendant Gary is married to Carl Icahn's wife's daughter. Since November 2010, Defendant Gary has served as Senior Vice President of Icahn Enterprises, LP. Since June 2003, Defendant Gary has been employed by Icahn Associates Corporation in various positions, including as Chief Operating Officer of Icahn Sourcing LLC. Like Defendant Icahn, Defendant Gary serves as a director of American Railcar Industries, Inc. and is also a director of WestPoint International, Inc. Each of these companies is a company for which Carl Icahn owns or has a substantial ownership interest.

94.    Defendant Nelson has served as a director of Icahn Enterprises GP, General Partner of Icahn Enterprises LP, since June 2001. Like Defendant Icahn, Defendant Nelson

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 28 -

serves as a director of Take-Two Interactive Software, Inc. and is also a director of Tropicana Entertainment, Inc., American Real Estate Partners LP, and Atlantic Coast Entertainment Holdings, Inc.  From April 2003 through April 2010, Defendant Nelson served as a director of Viskase Companies, Inc., and from January 2008 to June 2008, Nelson served as a director of Shuffle Master, Inc.  Each of the aforementioned companies—Icahn Enterprises, Take-Two Interactive Software, Inc., Tropicana Entertainment, Inc., American Real Estate Partners LP, Atlantic Coast Entertainment Holdings, Inc., Viskase Companies, Inc., and Shuffle Master, Inc.— is a company for which Carl Icahn owns or has a substantial ownership interest.

95.    These facts demonstrate more than a decade's worth of collaboration between Defendants Icahn, Gary, Nelson, and Carl Icahn.  The years of simultaneous service to multiple companies controlled by Carl Icahn suggest that Defendants Icahn, Gary, and Nelson have a developed relationship with aligned interests.  These relationships would preclude Defendants Icahn, Gary, and Nelson from independently considering Plaintiff's demand and would certainly obstruct their willingness to authorize suit against one another—this is especially true for Defendants Icahn and Gary, who are brothers-in-law.  Indeed, Defendants Icahn, Gary, and Nelson are proxies for Carl Icahn and are nothing more than rubber-stamps for Mr. Icahn.  As such, Defendants Icahn, Gary, and Nelson would be incapable of pursuing derivative claims that might negatively implicate each other since to do so would alienate Carl Icahn, to whom Defendants Icahn, Gary, and Nelson are beholden.  Because Director Defendants Gary, Icahn, and Nelson lack disinterestedness and independence, demand upon them would be futile.

96.    Moreover, Carl Icahn dominates the Board through Defendants Icahn, Gary, and Nelson—who make up a majority of the Board's members—and through certain arrangements Mr. Icahn has with the Company.  Motricity has, in fact, admitted a certain level of domination by Carl Icahn.  Motricity's SEC filings have explained that the Company is "engaged in certain agreements and transactions with entities controlled by Mr. Icahn."  *See* Motricity's Form 10-K/A, May 2, 2011.  For example, the Company described the following arrangement:

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 29 -

Icahn Sourcing LLC ("Icahn Sourcing") is an entity formed and controlled by Carl C. Icahn in order to leverage the potential buying power of a group of entities which Mr. Icahn either owns or with which he otherwise has a relationship in negotiating with a wide range of suppliers of goods, services, and tangible and intangible property. We are a member of this buying group and, as such, are afforded the opportunity to purchase goods, services and property from vendors with whom Icahn Sourcing has negotiated rates and terms. In return, Icahn Sourcing may disclose certain information to the vendors regarding our historic usage and future needs with respect to particular goods and services. Icahn Sourcing does not guarantee that we will purchase any goods, services or property from any such vendors and we are under no legal obligation to do so. Our agreement with Icahn Sourcing specifies no fees will be paid by either party to the other with respect to the buying group arrangement and that we may terminate our participation in the arrangement at any time. We have purchased a variety of goods and services as a member of the buying group at prices and on terms that we believe are more favorable than those which would be achieved on a stand-alone basis.

*Id.*

97.     Thus, the Company is, to an extent, dependent on Icahn Sourcing, a company owned by Carl Icahn, for continued participation in the buying group that provides the Company with "good, services, and tangible and intangible property."  Such domination would likely prevent even Defendants Judge and Firestone—the two Board members not personally affiliated with Mr. Icahn—from pursuing derivative claims that could implicate the directors nominated by Carl Icahn (*i.e.,* Defendants Icahn, Gary, and Nelson).

98.     Further, Plaintiff has not made a demand on the board of directors to bring the causes of action alleged herein because such a demand would be a futile and useless act for the following additional reasons:

a.     Director Defendants, because of their inter-related business, professional and personal relationships, have developed debilitating conflicts of interest that prevent the Board members of the Company from taking the necessary and proper action on behalf of the Company as requested herein.

VERIFIED SH'HOLDER DERIV. COMPLAINT      - 30 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

b.      The Director Defendants of Motricity, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise same.  Each of the Director Defendants exhibited a sustained and systematic failure to fulfill their fiduciary duties, which could not have been an exercise of good faith business judgment and amounted to gross negligence and extreme recklessness.

c.      In order to bring this suit, a majority of the Directors of Motricity would be forced to sue themselves and persons with whom they have extensive business and personal entanglements, which they will not do, thereby excusing demand.

d.      The acts complained of constitute violations of the fiduciary duties owed by Motricity's officers and directors and these acts are incapable of ratification.

e.      Motricity has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Motricity any part of the damages Motricity suffered and will suffer thereby.

f.      The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands.

g.      Any suit by the directors of Motricity to remedy these wrongs would likely expose the Defendants and Motricity  to violations of securities laws which could result in civil actions being filed against one or more of the Defendants thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves.

99.      Plaintiff has not made any demand on the shareholders of Motricity to institute this action since demand would be a futile and useless act for the following reasons:

VERIFIED SH'HOLDER DERIV. COMPLAINT       - 31 -

LAW OFFICES OF
CLIFFORD A. CANTOR, P.C.
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

a.      Motricity is a publicly held company with approximately 46.42 million shares outstanding, and thousands of shareholders;

b.      making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or phone numbers of all the shareholders; and

c.      Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

100.    Motricity has expended and will continue to expend significant sums of money as a result of the illegal and improper actions described above.  Such expenditures will include, but are not limited to, the costs the Company will incur to carry out internal investigations, including legal fees paid to outside counsel and experts, and the costs associated with the restatements of its financials.  As a further result of the Individual Defendants' breaches of their fiduciary duties, Motricity has additionally suffered reputational damage and the devaluation of its currently illiquid stock.

## COUNT I

### (against all defendants)

### for Breach of Fiduciary Duty

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    As alleged in detail herein, each of the Defendants had a duty to ensure that Motricity disseminated accurate, truthful and complete information to its shareholders.

103.    Defendants violated their fiduciary duties of care, loyalty, and good faith by: (i) causing or allowing the Company to disseminate to Motricity shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings and other public statements and disclosures as detailed herein; (ii) failing to maintain internal controls; and (iii) failing to properly oversee and manage the Company.  These actions could not have been a good faith exercise of prudent business judgment.

VERIFIED SH'HOLDER DERIV. COMPLAINT        - 32 -

104.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

## COUNT II

### (against all Defendants)

### for Unjust Enrichment

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of Motricity.

107.    Plaintiff, as a shareholder and representative of Motricity, seek restitution from these Defendants, and each of them, and seek an order of this Court disgorging all profits, benefits and other compensation obtained by these Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

Plaintiff requests judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing Motricity to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein;

C.    Awarding to Motricity restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits, and compensation obtained through their misconduct or during the period of their breach of fiduciary duties;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

LAW OFFICES OF
**CLIFFORD A. CANTOR, P.C.**
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:  (425) 868-7813 ● Fax:  (425) 868-7870

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated:  September 13, 2011          Respectfully submitted,

LAW OFFICES OF CLIFFORD A. CANTOR, P.C.
By:  s/ Cliff Cantor, WSBA # 17893
627 208th Ave. SE
Sammamish, WA  98074-7033
Tel:     (425) 868-7813
Fax:     (425) 868-7870

William B. Federman
FEDERMAN & SHERWOOD
10205 N. Pennsylvania Ave.
Oklahoma City, OK  73120
Tel:     (405) 235-1560
Fax:     (405) 239-2112

Attorneys for Plaintiff

VERIFIED SH'HOLDER DERIV. COMPLAINT          - 34 -

## VERIFICATION

I, Charles Weddle, declare that I have reviewed the Complaint ("Complaint") prepared on behalf of Motricity, Inc. [NASDAQ: MOTR], and I authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of Motricity, Inc. [NASDAQ: MOTR] common stock during the relevant time period in which the wrongful conduct alleged and complained of in the Complaint was occurring.

9-1-11
Date

Charles Weddle